Mark Woodsmall, Esq. SBN 188004
Justin Youngs, Esq. SBN 311585
WOODSMALL LAW GROUP, PC
2076 Lincoln Avenue
Pasadena, CA 91103
Telephone: (626) 440-0028
Facsimile: (626) 440-0068

Counsel for PLAINTIFFS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.P., by and through her guardians ad litem, V.P. and B.P.; V.P. and B.P., Individuals, | ) ) ) CASE NO.: 2:19-CV-7965 |
| Plaintiffs, | ) ) |
| v. | ) COMPLAINT FOR: ) |
| PASADENA UNIFIED SCHOOL DISTRCT, | ) PARTIAL REVERSAL OF ) ADMINISTRATIVE DUE PROCESS |
| Defendant. | ) DECISION AND RELIEF UNDER ) THE INDIVIDUALS WITH ) DISABILITIES EDUCATION ACT [20 ) U.S.C. § 1400 *et seq.*] |

A.P. ("Student"), a minor at all times relevant, by and through her parents as guardians ad litem, V.P. and B.P. ("Parents," collectively "Plaintiffs") file this complaint against the Pasadena Unified School District ("District" or "Defendant") as follows:

- 1 -

COMPLAINT

**JURISDICTION AND VENUE**

1.     Plaintiffs bring this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA" or "the Act"), the California Education Code § 56000 *et. seq.*, and Title 34 of the Code of Federal Regulations § 300 *et. seq.*

2.     This Court has original jurisdiction of this action pursuant to the following statutes:

     a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

     b. 28 U.S.C. § 1367, which gives the district courts supplemental jurisdiction over state law claims.

3.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because the events that gave rise to this Complaint occurred in this district.

4.     Exhaustion of administrative remedies has been satisfied as Plaintiffs have exhausted their administrative remedies through administrative due process matter, Case No. 2018110928, within the California Office of Administrative Hearings ("OAH"), Special Education Division.

**THE PARTIES**

5.     Student is a citizen of the United States and resides in the County of Los Angeles, State of California, which is in this judicial district.  Student has been identified as a pupil with a disability and has been found eligible for special education services pursuant to the IDEA and California law. Parents bring this action on Student's behalf as her guardians ad litem.

6.     District is a local educational agency ("LEA") in the County of Los Angeles, State of California.  As an LEA, District is responsible for providing a free appropriate public education ("FAPE") to students with disabilities in its service area.  At all times relevant to this matter, Student was a resident within

District's service area and District was responsible for providing a FAPE to Student.

## FACTUAL ALLEGATIONS

7.     Plaintiffs hereby re-allege Paragraphs 1-6 above and incorporate the same as fully set forth herein.

8.     The IDEA guarantees a child with a disability the substantive right to public education.  *Honig v. Doe*, 484 U.S. 305, 310 (1988).  Under the IDEA, a FAPE is defined as special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of the Act.  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17 (2006); Cal. Code Regs., tit. 5, § 3001, subd. (p). The California Education Code and its regulations closely resemble and adhere to the spirit of the IDEA.

9.     At all times relevant to this matter, Student has permanently resided with her family within Defendant's boundaries.  Student was determined eligible for special education services by Defendant as a student with an emotional disturbance.

10.     Student has been previously diagnosed with a Nonverbal Learning Disability, Generalized Anxiety Disorder with Agoraphobic Features and Perfectionistic Tendencies, Social Anxiety Disorder, Major Depression Disorder, and Specific Learning Disability in Math Fluency/Academic Fluency. Plaintiffs allege that symptoms of Student's condition have historically included considerable depression and anxiety, somatic symptoms characterized by migraines and stomach aches, and dermatillomania (obsessive skin picking). Student has also exhibited deficits in modulating sensory input, navigating social

- 3 -

interactions, and reading nonverbal social cues, all of which exacerbate Student's anxiety, depression, and isolation. Student engages in school refusal and non-attendance due to her crippling anxiety and depression.

11.    Student further presents as a twice-exceptional learner (hereinafter "2E"). As a 2E learner, Student presents as intellectually gifted, but exhibits a form of disability characterized by asynchronous development. Asynchronous development results in a discrepancy between cognitive, emotional, and physical development of gifted individuals, resulting in learning disabilities and severe deficits in social-emotional functioning. For Student, her asynchronous development presents in poor emotional regulation and executive functioning skills.

12.    Plaintiffs allege that Student's longstanding social emotional and academic difficulties were evident as early as elementary school. Prior to enrollment in the District in August 2017, Student attended two different high schools during her ninth grade year, Webb Schools and Halstrom Academy. During this time, Student exhibited severe anxiety associated with academic demands and socialization with peers, resulting in isolation, depression, and school refusal for significant periods of time. Student withdrew from Webb and Halstrom schools prior to the completion of the school term, earning only partial credit.

13.    Plaintiffs allege that after Student's considerable struggles at Webb and Halstrom, the family looked to their home school district for help in building an appropriate educational program for Student. Plaintiffs allege that Student enrolled in the District in August 2017. Prior to enrollment, Parents sought the assistance of Dr. Jody Leach, a clinical psychologist with expertise and experience working with 2E children. Dr. Leach worked closely with Student for several months prior to the move to address Student's elevated anxiety levels associated with entering a large public school environment.

COMPLAINT

14. Plaintiffs allege that Parents retained an additional expert, clinical psychologist Dr. Ashley Taylor, to conduct a psycho-educational assessment of Student in summer 2017. The purpose of the assessment was to gain an understanding of Ashley's social-emotional functioning, and to aid Parents and District in determining the appropriate supports Student required in her new educational setting.

15. Plaintiffs allege that Dr. Taylor completed an assessment report, dated August 8, 2017. The report included Dr. Taylor's findings that diagnosed Student with nonverbal learning disability, generalized anxiety, social anxiety disorder with agoraphobic features and perfectionistic tendencies, major depression disorder, and specific learning disability in math fluency/academic fluency. Plaintiffs allege that Dr. Taylor's report also confirmed Student's 2E profile as a gifted student with asynchronous development.

16. Plaintiffs allege that at the time of enrollment in or around August 2017, Parents spoke with a District counselor about Student's background and educational history, which included a pattern of chronic school refusal. The need for a Section 504 meeting[1] was discussed, and ultimately scheduled by the District to determine needed accommodations for Student.

17. Plaintiffs allege Student began her enrollment with the District at Pasadena High School (hereinafter "PHS") on or about August 14, 2017.

18. Plaintiffs allege that, on or about September 19, 2017, the District convened Student's 504 meeting. In attendance at the meeting were Parents, Dr. Taylor, Dr. Leach, several of Student's teachers at PHS, and a school counselor. Plaintiffs allege that Dr. Taylor's report was shared and reviewed with the District at the meeting, and a copy of the report was provided to the District. Dr. Leach also

---

[1] Section 504 meetings are in reference to Section 504 of Rehabilitation Act of 1973, a federal civil rights law prohibiting discrimination against students with disabilities. If a child qualifies for eligibility under the law, they are entitled to receive accommodations and supports to meet the child's individual educational needs as adequately as the needs of nondisabled students are met. *See* 29 U.S.C. § 794; 34 C.F.R. Part 104.

COMPLAINT

shared her clinical observations of Student and provided recommendations for accommodations in the educational environment.

19.     Plaintiffs allege that a 504 plan document was created as a result of the meeting. The document contains multiple references to Student's diagnoses and their manifestations in the educational environment, including references to "avoidance of school and academic assignments," "high stress, inability to manage and to engage in school work," and "[d]epression triggered by onset of anxiety and stress due to overwhelming workload or pressure from school."

20.     Plaintiffs allege that the District did not propose to assess Student for special education services and supports at or after the 504 meeting.

21.     Plaintiffs allege that Student was experiencing and exhibiting signs of significant anxiety and school refusal after the 504 meeting. Student exhibited behaviors such as refusing to leave her room, refusing to take medication, poor hygiene, refusing to eat, and picking her skin. Throughout the remainder of the fall semester and early spring semester at PHS, Student was absent from school approximately 30 times. Student failed to attend several final exams for the fall semester, and her grades in nearly all subjects fell from the beginning of the semester. Plaintiffs allege that District was aware of these difficulties and issued no less than 5 notices of tardiness and truancy during this time.

22.     Plaintiffs allege that the District did not propose to assess Student for special education services and supports following Student's academic declines and school refusal in the fall semester.

23.     Plaintiffs allege that by the 2017-2018 winter recess, Student was suffering from severe anxiety and depression. Student reported being unhappy with her performance at PHS, and felt she had no friends or support group at PHS. Student isolated herself in her room, skipped meals, did not engage in self-care or basic hygiene, and expressed hopelessness to Parents.

COMPLAINT

24.     Plaintiffs allege that on or about January 1, 2018, Student's depression and emotional state deteriorated to the point that she attempted to commit suicide by cutting both her wrists.

25.     Plaintiffs allege that Student was placed on a 72-hour psychiatric hold for her suicide attempt. Upon her release on or about January 5, 2018, Student was provided with medical wrap-around services in the home to monitor her mental health functioning.

26.     Plaintiffs allege that Parents notified the District of Student's suicide attempt and subsequent hospitalization shortly after Student's discharge on or about January 5, 2018.

27.     Plaintiffs allege that on or about January 10, 2018, the District convened a safety plan meeting to discuss Student's return to school after her suicide attempt. The District recommended changing Student's placement from PHS to the District's Center for Independent Studies program (hereinafter "CIS"). CIS offers an independent study program in which attendance in a specific class is not mandatory, and students are expected to complete coursework in accordance with work contracts for each class they are enrolled in.

28.     Plaintiffs allege that the District offered to assess Student for special education eligibility, and provided a special education assessment plan at the January 10, 2018 meeting. The assessment plan provided to Parents proposed assessment in the areas of academic achievement, health, intellectual development, social/emotional functioning, and educationally related intensive counseling service needs. The assessment plan did not propose to assess Student in the area of post-secondary transition. Parents signed the assessment plan on or about January 10, 2018, permitting the District to proceed with the assessment process.

29.     Plaintiffs allege that Plaintiff, on District's instruction, withdrew Student from PHS on or about January 26, 2018 and enrolled in CIS. Despite Student's change to an independent study program, she continued to suffer from

COMPLAINT

anxiety and school refusal. Student completed a total of three assignments while enrolled in CIS, and received notice of her non-compliance with her academic work contract.

30.     Plaintiffs allege that with Student's continued struggles in the winter and spring of 2018, Student faced a second consecutive year of academic and social-emotional struggles that were causing Student to fall further behind in the curriculum. With no alternative options to consider, Parents took action to locate a suitable educational placement capable of addressing Student's unique needs. On or about March 23, 2018, Parents provided written notice to the District of their intention to unilaterally place student at Bridges Academy, effective April 9, 2018. Parents' written notice further indicated its intent to seek reimbursement for tuition and related services at the appropriate time.

31.     Plaintiffs allege that the District convened an individualized education plan (hereinafter "IEP") meeting on or about April 27, 2018. At this meeting, the District presented its findings from various assessments conducted, had a discussion of special education eligibility, discussed proposed goals to target Student's areas of need, and shared its offer of a FAPE. An IEP document was generated by the District and provided to Parents at the IEP meeting.

32.     Plaintiffs allege that the District found Student eligible for special education supports and services under the eligibility category of emotional disturbance.

33.     Plaintiffs allege that the District made a first offer of FAPE for placement at CIS, where Student had recently withdrawn after struggling with school refusal and failure to complete assignments. Parents noted their concerns with the offer based on Student's difficulties at CIS in the months prior.

34.     Plaintiffs allege that over two hours after the IEP meeting began, the District brought in a special education coordinator to the meeting to discuss nonpublic school (hereinafter "NPS") placement options. The coordinator was not

involved in the assessment process of Student, had not been in attendance during the IEP team's discussion of Student's eligibility and areas of need, and otherwise had only limited knowledge of Student. The coordinator identified two NPS schools during this portion of the IEP meeting: Hillsides NPS and STEM-3 Academy. No representatives from either placement attended the meeting or were invited to attend to describe their programs or otherwise field questions from the IEP team.

35.     The District then made a second offer of FAPE for placement at an unspecified NPS. The District's second offer of FAPE included an offer of Education Support Services (hereinafter "ESS") for 90 days by an unspecified non-public agency, "career awareness" services for 60 minutes yearly to be provided by an unspecified NPS, "vocational assessment, counseling, guidance and career assessment" for 60 minutes yearly to be provided by an unspecified NPS, and psychological services for 30 minutes weekly to be provided by an unspecified non-public agency.

36.     Plaintiffs allege that the IEP document presented to Parents at the April 27, 2018 meeting did not name a specific NPS as an offer of educational placement.

37.     Plaintiffs allege that Parents toured the two NPS placements discussed at the IEP meeting, Hillside and STEM-3. After touring both placements and speaking with the administrators of both schools, Parents determined that neither school was appropriate to meet Student's unique needs. Parents sent correspondence to the District dated May 14, 2018, notifying the District of their belief of the inappropriateness of Hillside and STEM-3, and their intention to continue placing Student at Bridges Academy. In the same correspondence, Parents noted their consent to special education services under the eligibility category of emotional disturbance.

38.     Plaintiffs allege that the District did not respond to this correspondence, and did not request an additional IEP meeting to discuss further placement options.

39.     Plaintiffs allege that District issued correspondence dated July 3, 2018 that reiterated District's offer of placement at an unspecified NPS. The District subsequently issued no further correspondence and never convened an additional IEP meeting to discuss a specific educational placement.

40.     Plaintiffs allege that since Student's enrollment at Bridges Academy in April 2018, Student has performed well academically and has made great progress emotionally. Student has primarily received grades of "A" and "B," and has earned credits from all classes taken since her enrollment. Student has not engaged in school refusal due to anxiety and depression, is consistently attending school, and has made friends and established meaningful relationships with peers and staff.

41.     On or about November 27, 2018, Student by and through her Parents filed a request for an administrative due process hearing against Defendant. Student's request for hearing alleged educational claims under the IDEA and California law.  At issue in that matter, OAH Case No. 2018090015, was whether Defendant:

    1.   Denied Student a FAPE by failing to assess her for special education and related services in violation of its Child Find obligations;

    2.   Denied Student a FAPE by failing to appropriately assess her in all areas of known or suspected disability, specifically:

        a.     Psycho-education

        b.     Behavior

        c.     Educationally Related Mental Health Services

        d.     Occupational Therapy

        e.     Post-Secondary Transition

3.   Denied Student a FAPE in the April 27, 2018 IEP by:

   a.     Failing to make a clear offer of placement in a specific nonpublic school, thereby significantly impeding parent's opportunity to participate in the decision making process;

   b.     Failing to offer an appropriate placement;

   c.     Failing to offer an appropriate amount of counseling and psychological services;

   d.     Failing to offer occupational therapy services;

   e.     Failing to offer a behavior support plan

   f.     Failing to offer an appropriate individualized transition plan tailored to meet Student's unique needs with appropriate goals;

   g.     Failing to offer a program with research-based intervention; and

4.   Denied Student a FAPE by failing to provide Parent prior written notice regarding Parents' request as to eligibility and school placement made at the April 27, 2018 IEP team meeting.

42.   Hearing in Case No. 2018090015 was held on April 9, 10, 11, 15 and 16, 2019.

43.   The administrative law judge (hereinafter "ALJ") issued a decision ("Exhibit 1") on the aforementioned issues on June 17, 2019.  OAH's decision indicated that Defendant had prevailed on all issues and that Student's requests for relief were denied.

44.   Plaintiffs contend that in the underlying OAH decision, the ALJ improperly found that Defendant:

   a.   Did not deny Student a FAPE by failing to assess her for special education and related services in violation of its Child Find obligations (Issue 1).

b.  Did not deny Student a FAPE by failing to assess her in the area of post-secondary transition, and by failing to offer an appropriate individualized transition plan tailored to meet Student's unique needs with appropriate goals (Issues 2(e) and 3(f)).

c.  Did not deny Student a FAPE in the April 27, 2018 IEP by failing to make a clear offer of placement in a specific nonpublic school, thereby significantly impeding Parents' opportunity to participate in the decision making process (Issue 3(a)).

## FIRST CLAIM FOR RELIEF

Violation of 20 U.S.C. § 1412(a)(3) – Failure to Assess in Violation of Child Find

45.   Plaintiffs hereby re-allege Paragraphs 1-44 above and incorporate the same as fully set forth herein.

46.   Under the IDEA's "child find" provisions, all state and local educational agencies have an affirmative obligation to employ policies and procedures to ensure that "all children with disabilities residing in the State…and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located and evaluated."  *See* 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).  The child find obligation extends to every child who is suspected of being a child with a disability under 34 C.F.R. section 300.8 and in need of special education, even though the child is advancing from grade to grade.   34 C.F.R. § 300.111(c).

47.   The evidence at the administrative due process hearing established that Defendant failed to assess Student in violation of its child find obligation from September 19, 2017 to January 10, 2018.

48.   The failure of Defendant to assess Student from September 19, 2017 to January 10, 2018 violated the IDEA statute and regulations, requiring a LEA to

determine whether a child is a child with a disability, and to ascertain the educational needs of the child.

49.     Plaintiffs allege that the District had reason to suspect that Student had a disability and an impairment affecting educational performance at the time of her enrollment in August 2017. Upon enrollment, Parents shared Student's educational history, including her struggles at her previous placements at Webb and Halstrom. Parents also shared that Student was then receiving therapy for her social-emotional difficulties, and was receiving a psychological assessment. Parents' conversation with District and PHS staff upon enrollment resulted in the scheduling of a 504 meeting to determine needed accommodations for Student.

50.     Plaintiffs allege that the District did not propose to assess Student for special education services and supports at the time of enrollment in August 2017.

51.     Plaintiffs allege that the District had reason to suspect that Student had a disability and an impairment affecting educational performance at the time of the 504 meeting on or about September 19, 2017. At this meeting, Dr. Taylor shared her psycho-educational assessment report with the District, which included diagnoses of nonverbal learning disability, generalized anxiety, social anxiety disorder, major depression disorder, and specific learning disability in math fluency/academic fluency. Dr. Leach provided further insight into Student's needs in a school setting based on her therapy sessions with Student.

52.     Plaintiffs allege that a 504 plan document was created as a result of the meeting. The document contains multiple references to Student's diagnoses and their manifestations in the educational environment, including references to "avoidance of school and academic assignments," "high stress, inability to manage and to engage in school work," and "[d]epression triggered by onset of anxiety and stress due to overwhelming workload or pressure from school."

53.     Plaintiffs allege that the District did not propose to assess Student for special education services and supports at or after the 504 meeting.

- 13 -

54.     Plaintiffs allege that shortly after the 504 meeting, Student was experiencing and exhibiting signs of significant anxiety and school refusal. Student exhibited behaviors such as refusing to leave her room, refusing to take medication, refusing to eat, and picking her skin. Throughout the remainder of the fall semester and early spring semester at PHS, Student was absent from school approximately 30 times. Student failed to attend several final exams for the fall semester, and her grades in nearly all subjects fell from the beginning of the semester. Plaintiffs allege that Parents received no less than 5 notices of tardiness and truancy from the District during this time.

55.     Plaintiffs allege that the District did not propose to assess Student for special education services and supports following Student's academic declines and school refusal in the fall 2017 semester.

56.     The ALJ who rendered the administrative decision and order found that Defendant did not deny Student a FAPE by failing to assess Student for special education supports and services from September 19, 2017 to January 10, 2018.

57.     The ALJ noted in her decision that "Pasadena had no reason to assess Student for special education at the time of the Section 504 meeting." The ALJ improperly reached this conclusion despite testimony and documentary evidence revealing the District's actual knowledge of, and acknowledgement of Student's diagnoses and impairments to learning as of the September 19, 2017 504 meeting. In addition to a 504 plan document entered into evidence, which included numerous references to Student's depression, anxiety, and school refusal, testimony of Parent, Dr. Leach, and Dr. Taylor revealed that the 504 meeting included explicit discussion of Student's social-emotional struggles and history of school refusal. Additionally, Dr. Taylor's psycho-educational report entered into evidence, which contained comprehensive discussion of Student's diagnoses and associated learning impairments, was provided to the District at the 504 meeting.

58.     The ALJ noted in her decision that "Pasadena Unified was unaware of the extent, if any, to which Student's absences and tardies were due to Student's mental health issues that Parents, Dr. Taylor, and Dr. Leach reported at the Section 504 meeting." The ALJ improperly reached this conclusion despite the fact that the 504 document and Dr. Taylor report entered into evidence explicitly referenced Student's struggles with school refusal and work avoidance due to depression and anxiety. Testimony from Dr. Leach and Parent, as well as Student's counselor, revealed Student's considerable difficulties with anxiety and depression, and resulting issues with attendance and school refusal.

59.     The ALJ noted in her decision that "Pasadena Unified was entitled to wait for a reasonable period of time after the development of the 504 Plan to see whether it worked, and given what they knew, they did not act unreasonably in relying upon general education interventions for a semester." The ALJ cited no legal authority for the conclusion that the District was entitled to wait to see if the 504 Plan worked, and to the contrary, legal authority and the facts of the instant case do not support this conclusion.

60.     The ALJ noted in her decision that "parents provided no information to Pasadena Unified that Student's mental and social-emotional condition had severely deteriorated during the fall semester," and concluded that "[u]nder these circumstances, Pasadena Unified had no reason to suspect Student was one with a disability who required special education." The ALJ's position that Parents held the burden of affirmative action in regards to the District's child find obligation is not supported under federal authorities and well-established case law.

61.     The ALJ noted in her decision that Student received passing grades during the relevant time period, performed well, and that none of her teachers reported negative changes in Student's attitude or behavior. The ALJ failed to consider highly relevant testimony from Student's teachers that Student failed to appear for final exams, failed to attend class, failed to submit assignments, and did

not work to her potential. The ALJ further failed to consider Student's grade report entered into evidence, which revealed declining grades as the fall 2017 semester wore on. The ALJ also failed to consider testimony from Parent, Dr. Taylor, and Dr. Leach that highlighted Student's 2E profile and ability to maintain passing grades while exhibiting severe social-emotional struggles.

62.     As a result of Defendant's failure to assess Student in violation of its child find obligation, Plaintiffs allege that Student has not received a FAPE in that the violation impeded her right to a FAPE, significantly interfered with Parents' right to participate in the decision-making process concerning the provision of a FAPE to Student, and caused a deprivation of educational benefit to Student.

## SECOND CLAIM FOR RELIEF

Violation of 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) – Failure to Conduct a Post-Secondary Transition Assessment and Offer Appropriate Transition Supports and Services

63.     Plaintiffs hereby re-allege Paragraphs 1-62 above and incorporate the same as fully set forth herein.

64.     IDEA and California law require that by the time a child with a disability reaches the age of 16, the school district must have an IEP in effect that includes "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb); 34 C.F.R. § 300.320(b)(1)-(2); Cal. Ed. Code § 56345(a)(8).

65.     Federal regulations highlight the importance of transition planning and services being "designed to be *within a results-oriented process*, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities." 34 C.F.R. § 300.43(a)(1) [emphasis added].

- 16 -

66.     Plaintiffs allege that, at the time the District proposed to assess Student for special education on or about January 10, 2018, Student was 17 years of age.

67.     The evidence at the administrative due process hearing established that Defendant failed to develop an IEP that included appropriate measurable postsecondary goals based on upon age appropriate transition assessments related to training, education, employment, and independent living skills.

68.     The failure of Defendant to assess Student in all areas of known or suspected need violates the IDEA statute and regulations, requiring a LEA to determine whether a child is a child with a disability, and to ascertain the educational needs of the child.

69.     Plaintiffs allege that the District, at all times relevant, failed to conduct any type of transition assessment of Student. The assessment plan offered and executed by Parents on or about January 10, 2018 did not propose to assess Student for post-secondary transition supports.

70.     Plaintiffs allege that an individual transition plan was included in Student's April 27, 2018 IEP document. The transition plan within the IEP stated that age-appropriate transition assessments were used in the form of an interview with student.

71.     Plaintiffs allege that no testimony or documentary evidence presented at hearing showed that a transition assessment, including an interview of Student, occurred. Parent testified that they were not aware of any transition assessment that occurred, and were not asked to complete any surveys related to a transition assessment. The ALJ noted in her decision that "the weight of the evidence therefore demonstrates that there was likely no informal age-appropriate transition assessment."

72.     Plaintiffs allege that the transition plan embedded within Student's April 27, 2018 IEP document was not based on any type of age-appropriate transition assessment.

73.     Plaintiffs allege that the transition plan further failed to include appropriate, measurable goals, and instead offered two goals for "Training or Education" and "Employment" that were vague and not capable of measurement. The transition plan and IEP failed to include any goals related to independent living, despite testimony and documentary evidence revealing Student's struggles with grooming, managing medication, eating, and tardiness prior to the development of the IEP. The transition plan also failed to provide accommodations or modifications to support Student's post-secondary transition, and only lists boilerplate activities not unique to Student's interests, needs and strengths.

74.     Plaintiffs allege that the transition services offered to Student in the April 27, 2018 IEP were not determined based on any type of age-appropriate transition assessment, and did not take into consideration Student's unique needs and abilities. The IEP document specified that the services were to be provided by "Nonpublic school (NPS) under contract with SELPA or district," yet no specific NPS was identified as the offer of placement for Student at the April 27, 2018 IEP, and no representatives from any NPS were invited or present at the IEP to discuss the services offered.

75.     The ALJ noted in her decision that the "informal" transition assessment reflected in Student's transition plan did not require parental consent. The ALJ cited to an Office of Special Education Programs (hereinafter "OSEP") guidance letter, "*Letter to Olex*, 119 LRP 8445 (Feb. 22, 2019)" as authority. The ALJ's conclusion is erroneous and misstates OSEP's legal guidance as presented in *Letter to Olex*. The guidance letter explicitly states that "it is the position of the Office of Special Education Programs that in general, IDEA does not require a public agency to obtain parental consent before conducting [transition]

assessments, unless the assessments are part of an initial evaluation or reevaluation." Plaintiffs allege that Student's April 27, 2018 was Student's initial IEP based upon initial evaluation for special education services and supports.

76.     The ALJ noted in her decision that "[a] transition assessment may be informal, or may not even be required to support a transition plan," followed by a citation to *M.M. v. New York City Dept. of Ed.*, 655 Fed. Appx. 868 (2d. Cir. 2016) to support the conclusion. The ALJ's reliance on *M.M.* is misplaced, as the facts of that case are inapposite to the instant case. Further, the ALJ noted that the Court in the *M.M.* case found no violation of the IDEA for failure to conduct a transition assessment because the IEP team "had sufficient information about Student's transition needs to enable the team to develop his IEP." Plaintiffs allege that Student's IEP team did not have sufficient information about Student's transition needs, as no age-appropriate transition assessment of any kind was conducted by the District.

77.     The ALJ noted in her decision that "the failure to conduct an informal transition assessment did not constitute a deprivation of a FAPE because the content of the transition plan was appropriate." The ALJ improperly reached this conclusion, as the content of the transition plan and IEP failed to include appropriate measureable goals in the areas of training, education, employment, and independent living skills reflecting Student's strengths, preferences, and interests, and failed to include accommodations and supports unique to Student's needs and abilities.

78.     As a result of Defendant's failure to conduct an age-appropriate transition assessment, failure to develop an appropriate transition plan, and failure to offer appropriate transition services and supports, Plaintiffs allege that Student has not received a FAPE in that the violation impeded her right to a FAPE, significantly interfered with Parents' right to participate in the decision-making

- 19 -

process concerning the provision of a FAPE to Student, and caused a deprivation of educational benefit to Student.

### THIRD CLAIM FOR RELIEF

<u>Violation of 20 U.S.C. §§ 1414(e) and 1415(b)(1) – Failure to Make a Specific Offer of Placement, Thereby Denying Parents' Ability to Meaningfully Participate in the IEP Process</u>

79.    Plaintiffs hereby re-allege Paragraphs 1-78 above and incorporate the same as fully set forth herein.

80.    Amongst other requirements, an IEP must include "A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child: (i) To advance appropriately toward attaining the annual goals; (ii) To be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section, and to participate in extracurricular and other nonacademic activities; and (iii) To be educated and participate with other children with disabilities and nondisabled children in the activities described in this section. 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV)(aa)-(cc); 34 C.F.R. § 300.320(a)(4).

81.    In *W.G. v. Target Range*, 960 F.2d 1479, 1483 (9th Cir. 1992), the Ninth Circuit recognized the IDEA's emphasis on the importance of meaningful parent participation in the IEP process.  When developing a pupil's IEP, the IEP team shall consider the concerns of the parents or guardians for enhancing the education of the pupil. Cal. Ed. Code, § 56341.1(a)(2).  Moreover, an important aspect of the parents' right to participate in the IEP process is the LEA's obligation to make a formal, written offer which clearly identifies the proposed program. *Union Sch. Dist. v. Smith* 15 F.3d 1519, 1526 (9th Cir. 1994). The requirement of a formal, written offer creates a clear record that helps eliminate troublesome factual

- 20 -

disputes years later, and alerts the parents to the need to consider seriously whether the offered placement was an appropriate placement under the IDEA, so that the parents can decide whether to oppose the offered placement or to accept it with the supplement of additional education services. *Glendale Unified School Dist. v. Almasi*, 122 F.Supp.2d 1093, 1107 (C.D. Cal. 2000) (citing *Union*, *supra*, 15 F.3d at 1526). A formal written offer is more than a mere technicality, and is vigorously enforced. *Union*, *supra*, 15 F.3d at 1526.

82.     The evidence at hearing established that the Defendant failed to provide a specific offer of placement in the April 27, 2018 IEP. Evidence further established that this failure impeded Parents' right to participate in the IEP process and denied Student a FAPE.

83.     Plaintiffs allege that at the April 27, 2018 IEP meeting, the District made multiple offers of placement. The District first offered Student placement at CIS with related services. After Parents voiced their concern and disagreement with having Student continue at CIS, the District made a second offer of placement at an unspecified NPS.

84.     Plaintiffs allege that over two hours after the IEP meeting began, the District brought in a special education coordinator to the meeting to discuss NPS placement options. The coordinator was not involved in the assessment process of Student, had not been in attendance during the IEP team's discussion of Student's eligibility and areas of need, and otherwise had very limited knowledge of Student. The coordinator identified two NPS schools during this portion of the IEP meeting: Hillsides NPS and STEM-3 Academy. No representatives from either placement attended the meeting or were invited to attend.

85.     Plaintiffs allege that discussion of the two identified NPS placements contained only information that the District's coordinator had knowledge of. The information of the placements shared with Parents did not include vital information regarding specific classrooms Student would be placed in, the teacher or type of

curriculum to be provided to Student at the NPS, or the contents of Student's specific program at either school. Plaintiffs allege that only generalities of the two NPS placements were shared, and that no one at the IEP meeting was able to express how the NPS placements could deliver a FAPE to Student.

86.     Plaintiffs allege that the IEP document provided to Parents after the April 27, 2018 meeting provided for an offer of placement at an unspecified NPS. No specific NPS option was identified as the District's offer of placement in the document. Parent testified at hearing that they did not believe the District's offer was complete because there was no one offer of an NPS school.

87.     Plaintiffs allege that Parents toured the two NPS placements discussed at the IEP meeting, Hillside and STEM-3. After touring both placements and speaking with the leaders of both schools, Parents determined that neither school was appropriate to meet Student's unique needs. Parents sent correspondence to the District dated May 14, 2018, notifying the District of their belief of the inappropriateness of Hillside and STEM-3, and their intention to continue placing Student at Bridges Academy. In the same correspondence, Parents noted their consent to special education services under the eligibility category of emotional disturbance.

88.     Plaintiffs allege that the District did not respond to this correspondence, and did not request an additional IEP meeting to discuss further placement options.

89.     Plaintiffs allege that District issued correspondence dated July 3, 2018 that reiterated District's offer of placement at an unspecified NPS. The District subsequently issued no further correspondence, and never convened an additional IEP meeting to discuss a specific educational placement.

90.     Plaintiffs allege that Parent B.P., the District's coordinator that identified the two NPS placements, and the District's current special education

COMPLAINT

director testified at hearing that they could not name the specific NPS placement offered to Student at the April 27, 2018 IEP meeting.

91.   Plaintiffs allege that Parents were left to fend for themselves to determine which NPS placement would be sufficient for Student, and that the District's unclear offer of placement placed an undue burden on the family that made it difficult for Parents to decide whether to accept the District's IEP offer.

92.   The ALJ notes in her decision that "[t]he April 27, 2018 IEP comports with the IDEA," and that it "contains a single, final, formal offer of a FAPE, as required by *Union*." The ALJ erroneously arrived at this conclusion by relying on *Rachel H. v Dept. of Ed., State of Hawaii*, 868 F.3d 1085 (9th Cir. 2017), a case with facts entirely distinguishable from the instant matter, and one that Plaintiffs took care to distinguish in their closing brief submitted post-hearing. The ALJ further failed to discuss or reference at least two cases cited by Plaintiffs in their closing brief that provided ample authority for the procedural violation underlying the District's unclear offer of placement.

93.   The ALJ notes in her decision that "Pasadena Unified could not guarantee that Student would be able to enroll in a specific nonpublic school, and it would therefore be unreasonable to require it to specify one in the IEP." The ALJ includes this analysis without citing any legal authority supporting this factor as relevant to determining the appropriate specificity of an IEP offer and meaningful parent participation.

94.   As a result of Defendant's failure to make a specific offer of placement, Plaintiffs allege that Student has not received a FAPE in that the violation impeded her right to a FAPE, significantly interfered with Parents' right to participate in the decision-making process concerning the provision of a FAPE to Student, and caused a deprivation of educational benefit to Student.

///

///

COMPLAINT

# PRAYER FOR RELIEF

95. WHEREFORE, Plaintiffs respectfully pray for the following relief:

   A. For an order that the administrative due process decision in OAH Case No. 2018110928, in regards to whether Defendant denied Student a FAPE by failing to assess her in violation of its child find obligation, was not supported by the evidence presented at the due process hearing nor by the law and shall be reversed.

   B. For an order that the due process decision in OAH Case No. 2018110928, in regards to whether Defendant denied Student a FAPE by failing to assess her in the area of post-secondary transition, and by failing to offer an appropriate individualized transition plan tailored to meet Student's unique needs with appropriate goals, was not supported by the evidence presented at the due process hearing nor by the law and shall be reversed.

   C. For an order that the due process decision in OAH Case No. 2018110928, in regards to whether Defendant denied Student a FAPE in the April 27, 2018 IEP by failing to make a clear offer of placement in a specific nonpublic school, thereby significantly impeding parent's opportunity to participate in the decision making process, was not supported by the evidence presented at the due process hearing nor by the law and shall be reversed.

   D. For an order that Plaintiffs are entitled to recover the non-reimbursed, private costs paid by Parents for private school tuition and fees, transportation to and from Student's private school, Student's therapeutic counseling services, and transition services during the statutory period, amount subject to proof.

   E. For reasonable attorney's fees and costs to Plaintiffs for services provided by counsel associated with the underlying administrative

- 24 -

COMPLAINT

due process hearing, Case No. 2018110928, as permitted by 20 U.S.C. § 1415(i)(3);

F.  For attorney's fees and costs of suit as permitted pursuant to 20 U.S.C. § 1415(i)(3);

G.  For an award of reasonable attorneys' fees and costs of suit in the instant district court matter;

H.  For such other and further relief as the Court deems proper.

Dated:       September 13, 2019

Respectfully submitted,

WOODSMALL LAW GROUP, PC

By:  _____/s/_____
     Mark Woodsmall
     Attorney for Plaintiffs

COMPLAINT