Mark Woodsmall, Esq. SBN 188004
Justin Youngs, Esq. SBN 311585
WOODSMALL LAW GROUP, PC
2076 Lincoln Avenue
Pasadena, CA 91103
Telephone: (626) 440-0028
Facsimile: (626) 440-0068

Counsel for PLAINTIFFS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.P., by and through her guardians ad litem, V.P. and B.P.; V.P. and B.P., Individuals,<br><br>Plaintiffs,<br><br>v.<br><br>PASADENA UNIFIED SCHOOL DISTRCT,<br><br>Defendant. | ) CASE  NO.:  2:19-CV-7965-MWF<br>) (SSx)<br>)<br>)<br>)<br>) PLAINTIFFS' NOTICE OF<br>) MOTION AND MOTION FOR<br>) SUMMARY JUDGMENT;<br>) MEMORANDUM OF POINTS<br>) AND AUTHORITIES<br>)<br>)<br>) DATE:  November 16, 2020<br>) TIME:   10:00 A.M.<br>) CTRM:  5A<br>) JUDGE: HON. MICHAEL W.<br>) FITZGERALD<br>)<br>) |

## NOTICE OF MOTION AND MOTION

TO DEFENDANT AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that on November 16, 2020 at 10:00 A.M., or as soon thereafter as counsel may be heard by the above-entitled court, Plaintiffs A.P., by and through her guardians ad litem, V.P. and B.P., and V.P. and B.P., individuals,

will and hereby do move the Court for an order granting summary judgment to Plaintiffs as to all of Plaintiffs' claims for relief, pursuant to Fed. R. Civ. Proc. 56 and Local Rule 56.

Plaintiffs bring this motion on the grounds that they are entitled to summary judgment, and partial reversal of the underlying administrative due process hearing decision, because the underlying administrative decision is in error, and Plaintiff A.P. was denied a Free and Appropriate Public Education under the Individuals with Disabilities Education Act. Plaintiffs' motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Plaintiffs' Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law, the pleadings and papers on file herein, and any further material and argument presented to the Court at the time of the hearing.

This motion is made following mediation on July 22, 2020, and the conference of counsel pursuant to Local Rule 7-3, which took place on September 10 and 15, 2020.

Dated:          October 15, 2020

Respectfully submitted,
WOODSMALL LAW GROUP, PC


By:          /s/
          Mark Woodsmall
          Attorney for Plaintiffs

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................... i

TABLE OF AUTHORITIES .................................................. iii

I. INTRODUCTION ........................................................1

II. PROCEDURAL AND FACTUAL HISTORY ..............................2

III. LEGAL ARGUMENT ....................................................7

    A.    THE DISTRICT FAILED TO ASSESS STUDENT IN VIOLATION OF ITS CHILD FIND OBLIGATIONS, THEREBY DENYING STUDENT NECESSARY SPECIAL EDUCATION SUPPORTS AND SERVICES ...................................................................7

        1.  Evidence Presented at the Administrative Due Process Hearing Established that District Failed to Assess Student Despite Actual Knowledge of Her Disability ................................9

        2.  The Administrative Findings Concerning Child Find Should Not Receive "Due Weight."........................................11

    B.    THE DISTRICT FAILED TO CONDUCT A POST-SECONDARY TRANSITION ASSESSMENT, AND FAILED TO OFFER APPROPRIATE POST-SECONDARY TRANSITION SERVICES .....14

        1.  The District Did Not Conduct an Age-Appropriate Transition Assessment.........................................15

        2.  The Lack of Assessment and District's Transition Plan in the IEP Resulted in Educational Harm .............................15

        3.  The Administrative Findings Concerning Transition Supports Should Not Receive "Due Weight."..............................18

    C.    DISTRICT FAILED TO MAKE A SPECIFIC OFFER OF PLACEMENT, THEREBY PROCEDURALLY DENYING STUDENT A FAPE ................................................................20

1. District's Offer of Two Distinct School Placements Precluded Meaningful Participation and Informed Consent to the IEP ............20

2. The Administrative Findings Concerning Clarity of Offer Should Not Receive "Due Weight." ..............................................23

D.   THE ADMINISTRATIVE DECISION SHOULD BE REVERSED, THUS ENTITLING STUDENT TO REIMBURSEMENT ...................24

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Florence County School District Four v. Carter*, 510 U.S. 7, 13-14 (1993)..........25

*School Committee of Town of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369-70 (1985) ................................................................................................24

*Smith v. Robinson,* 468 U.S. 992, 1018 (1984). ........................................................8

## NINTH CIRCUIT CASES

*Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) ..............................8

*Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887-89 (9th Cir. 2001). ...............................................................................................................7

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F. 3d 884, 891 (9th Cir. 1995)....
.....................................................................................................................7, 11

*Hacienda La Puente Sch. Dist. of Los Angeles v. Honig*, 876 F.2d 487, 495 (9th Cir. 1992) ...........................................................................................................14

*L.M. v. Capistrano Unified School Dist.*, 556 F.3d 900, 909 (9th Cir. 2009) ........16

*N.B. v. Hellgate Elementary School District*, 541 F.3d 1202 (9th Cir. 2008) ........12

*Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993) ..........7

*Pasatiempo v. Aizawa*, 103 F.3d 796, 802 (9th Cir. 1996) .....................................12

*Rachel H. v. Dept. of Ed., State of Hawaii,* 868 F.3d 1085, 1087, 1092 (9th Cir. 2017) ..................................................................................................22, 23

*Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105 (9th Cir. 2016).....
...........................................................................................................8, 12, 13

*Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) .......................20, 21

*W.G., et al. v. Board of Trustees of Target Range School Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992) ........................................................................................9

## OTHER CIRCUIT CASES

*A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672, 681 (4th Cir. 2007)...............................................................................................21, 23

*Gagliardo v. Arlington Central School District*, 489 F.3d 105, 113-15 (2d. Cir. 2007) ........................................................................................................25

*RB ex rel. Parent v. Mastery Charter School*, 762 F.Supp.2d 745, 762 (E.D. Pa. 2010).......................................................................................................14

*Lessard v. Wilton-Lyndeborough Coop. School Dist.*, 518 F.3d 18 (1st Cir. 2008) ...........................................................................................................19

*M.M. v. New York City Dept. of Ed.*, 655 Fed.Appx. 868 (2d Cir. 2016) ..............18

**DISTRICT COURT CASES**

*Carrie I. ex rel. Greg I. v. Dep't of Educ., Hawaii,* 869 F.Supp.2d 1225 (D. Haw. 2012) ..................................................................................................16, 19

*Dept. of Educ., Haw. v. Cari Rae S.,* 158 F. Supp. 2d 1190 (D. Haw. 2001)..1, 8, 12

*Dracut Sch. Comm. V. Bureau of Special Educ. Appeals of Mass. Dep't of Elem. & Secondary Educ.*, 737 F.Supp.2d 35, 51 (D. Mass. 2010)......................................19

*Forest Grove Sch. Dist. v. Student*, 2014 WL 2592654, at *29 (D. Or. 2014) .......15

*Glendale Unified School Dist. v. Almasi,* 122 F.Supp.2d 1093, 1106-08 (C.D. Cal. 2000) ...............................................................................................20, 21

*Katherine G. ex rel Cynthia G. v. Kentfield Sch. Dist.*, 261 F. Supp. 2d. 1159, 1167 (N.D. Cal. 2003) .................................................................................................7

*M.M. v. New York City Dept. of Ed.*, Case No. 1:14-cv-01542-GBD (S.D.N.Y. Mar. 18, 2015) ..................................................................................................18

*S.G.W., et al. v. Eugene School Dist.*, Case No. 6:16-cv-01612-AA at *12-14 (D. Or. 2017) ....................................................................................................15, 16

*Simmons v. Pittsburg Unified School Dist.* (N.D. Cal. 2014) 2014 WL 2738214 ...8, 14

*Virginia S. v. Dept. of Educ.*, 2007 U.S. Dist. Lexis 1518 at *24-25 (D. Hawaii, Jan. 8, 2007 ) ...............................................................................................17, 19

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**STATE ADMINISTRATIVE CASES**

*Parents on Behalf of Student v. Poway Unified School District*, (OAH CA 2018)

OAH Case No. 2018060763, 2018080048 ......................................................21, 22

**FEDERAL STATUTES**

20 U.S.C. § 1400(c)(14) ...............................................................................15

20 U.S.C. § 1400(d)(1)(A) ..............................................................................1

20 U.S.C. § 1400(d)(4) ..................................................................................1

20 U.S.C. § 1412(a)(3) ..................................................................................1

20 U.S.C. § 1412(a)(3)(A) .............................................................................8

20 U.S.C. § 1412(a)(10)(C)(ii) ......................................................................24

20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb) ................................................14

20 U.S.C. § 1415(i)(2)(C) ..............................................................................7

20 U.S.C. § 1415(f)(3)(E)(ii) ..........................................................................8

29 U.S.C. § 794 ..............................................................................................3

**FEDERAL REGULATIONS**

34 C.F.R. Part 104 ..........................................................................................3

34 C.F.R. § 300.43(a)(1) ..............................................................................15

34 C.F.R. § 300.111(a)(1)(i) ..........................................................................8

34 C.F.R § 300.111(c) ....................................................................................8

34 C.F.R. § 300.148(c) ..................................................................................24

34 C.F.R. § 300.320(b) ................................................................................15

34 C.F.R. § 300.320(b)(1)-(2) ......................................................................14

34 C.F.R. § 300.321(b)(3) ............................................................................20

**CALIFORNIA STATE LAW**

Cal. Ed. Code § 56303 ................................................................................14

Cal. Ed. Code § 56345(a)(8) ........................................................................15

Cal. Ed. Code § 56345(a)(8)(A) ..................................................................15

**OTHER AUTHORITY**

Webb, J. T., Amend, E. R., Webb, N. E., Goerss, J., Beljan, P., & Olenchak, F. R. (2005). *Misdiagnosis and dual diagnoses of gifted children and adults*: *ADHD, bipolar, OCD, Asperger's, depression and other disorders*. 125-136, Scottsdale, AZ: Great Potential Press ........................................................................................1

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................................... i

TABLE OF AUTHORITIES ................................................ iii

I. INTRODUCTION .......................................................... 1

II. PROCEDURAL AND FACTUAL HISTORY ........................ 2

III. LEGAL ARGUMENT .................................................. 7

    A.   THE DISTRICT FAILED TO ASSESS STUDENT IN VIOLATION OF ITS CHILD FIND OBLIGATIONS, THEREBY DENYING STUDENT NECESSARY SPECIAL EDUCATION SUPPORTS AND SERVICES ............................................................. 7

        1.  Evidence Presented at the Administrative Due Process Hearing Established that District Failed to Assess Student Despite Actual Knowledge of Her Disability ................................ 9

        2.  The Administrative Findings Concerning Child Find Should Not Receive "Due Weight." ........................................ 11

    B.   THE DISTRICT FAILED TO CONDUCT A POST-SECONDARY TRANSITION ASSESSMENT, AND FAILED TO OFFER APPROPRIATE POST-SECONDARY TRANSITION SERVICES ..... 14

        1.  The District Did Not Conduct an Age-Appropriate Transition Assessment ......................................................... 15

        2.  The Lack of Assessment and District's Transition Plan in the IEP Resulted in Educational Harm ................................. 15

        3.  The Administrative Findings Concerning Transition Supports Should Not Receive "Due Weight." .................................... 18

    C.   DISTRICT FAILED TO MAKE A SPECIFIC OFFER OF PLACEMENT, THEREBY PROCEDURALLY DENYING STUDENT A FAPE ............................................................. 20

1.  District's Offer of Two Distinct School Placements Precluded Meaningful Participation and Informed Consent to the IEP ............... 20

2.  The Administrative Findings Concerning Clarity of Offer Should Not Receive "Due Weight." .................................................. 23

D.     THE ADMINISTRATIVE DECISION SHOULD BE REVERSED, THUS ENTITLING STUDENT TO REIMBURSEMENT ................... 24

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**SUPREME COURT CASES**

*Florence County School District Four v. Carter*, 510 U.S. 7, 13-14 (1993)..........25

*School Committee of Town of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369-70 (1985) ...................................................................................................24

*Smith v. Robinson,* 468 U.S. 992, 1018 (1984). .......................................................8

**NINTH CIRCUIT CASES**

*Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) .............................8

*Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887-89 (9th Cir. 2001). ..................................................................................................................7

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F. 3d 884, 891 (9th Cir. 1995).....
...............................................................................................................................7, 11

*Hacienda La Puente Sch. Dist. of Los Angeles v. Honig*, 876 F.2d 487, 495 (9th Cir. 1992) ...............................................................................................................14

*L.M. v. Capistrano Unified School Dist.*, 556 F.3d 900, 909 (9th Cir. 2009) ........16

*N.B. v. Hellgate Elementary School District*, 541 F.3d 1202 (9th Cir. 2008) ........12

*Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993) ..........7

*Pasatiempo v. Aizawa*, 103 F.3d 796, 802 (9th Cir. 1996) .....................................12

*Rachel H. v. Dept. of Ed., State of Hawaii,* 868 F.3d 1085, 1087, 1092 (9th Cir. 2017) ..............................................................................................................22, 23

*Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105 (9th Cir. 2016).....
.........................................................................................................................8, 12, 13

*Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) ......................20, 21

*W.G., et al. v. Board of Trustees of Target Range School Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992) ...................................................................................................9

**OTHER CIRCUIT CASES**

*A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672, 681 (4th Cir. 2007).....................................................................................................................21, 23

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*Gagliardo v. Arlington Central School District*, 489 F.3d 105, 113-15 (2d. Cir. 2007) ........................................................................................................25

*RB ex rel. Parent v. Mastery Charter School*, 762 F.Supp.2d 745, 762 (E.D. Pa. 2010).........................................................................................................14

*Lessard v. Wilton-Lyndeborough Coop. School Dist.*, 518 F.3d 18 (1st Cir. 2008) ............................................................................................................19

*M.M. v. New York City Dept. of Ed.*, 655 Fed.Appx. 868 (2d Cir. 2016) ..............18

**DISTRICT COURT CASES**

*Carrie I. ex rel. Greg I. v. Dep't of Educ., Hawaii,* 869 F.Supp.2d  1225 (D. Haw. 2012) ...................................................................................................16, 19

*Dept. of Educ., Haw. v. Cari Rae S.,* 158 F. Supp. 2d 1190 (D. Haw. 2001)..1, 8, 12

*Dracut Sch. Comm. V. Bureau of Special Educ. Appeals of Mass. Dep't of Elem. & Secondary Educ.*, 737 F.Supp.2d 35, 51 (D. Mass. 2010)......................................19

*Forest Grove Sch. Dist. v. Student*, 2014 WL 2592654, at *29 (D. Or. 2014) .......15

*Glendale Unified School Dist. v. Almasi,* 122 F.Supp.2d 1093, 1106-08 (C.D. Cal. 2000) .................................................................................................20, 21

*Katherine G. ex rel Cynthia G. v. Kentfield Sch. Dist.*, 261 F. Supp. 2d. 1159, 1167 (N.D. Cal. 2003) ..............................................................................................7

*M.M. v. New York City Dept. of Ed.*, Case No. 1:14-cv-01542-GBD (S.D.N.Y. Mar. 18, 2015) .................................................................................................18

*S.G.W., et al. v. Eugene School Dist.*, Case No. 6:16-cv-01612-AA at *12-14 (D. Or. 2017) ...................................................................................................15, 16

*Simmons v. Pittsburg Unified School Dist.* (N.D. Cal. 2014) 2014 WL 2738214 ...8, 14

*Virginia S. v. Dept. of Educ.*, 2007 U.S. Dist. Lexis 1518 at *24-25 (D. Hawaii, Jan. 8, 2007 ) ..............................................................................................17, 19

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**STATE ADMINISTRATIVE CASES**

*Parents on Behalf of Student v. Poway Unified School District*, (OAH CA 2018)

OAH Case No. 2018060763, 2018080048 ..................................................21, 22

**FEDERAL STATUTES**

20 U.S.C. § 1400(c)(14) ..................................................................................15

20 U.S.C. § 1400(d)(1)(A) ..................................................................................1

20 U.S.C. § 1400(d)(4) .......................................................................................1

20 U.S.C. § 1412(a)(3) .......................................................................................1

20 U.S.C. § 1412(a)(3)(A) ..................................................................................8

20 U.S.C. § 1412(a)(10)(C)(ii) .........................................................................24

20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb) ...................................................14

20 U.S.C. § 1415(i)(2)(C) ...................................................................................7

20 U.S.C. § 1415(f)(3)(E)(ii) .............................................................................8

29 U.S.C. § 794 ...................................................................................................3

**FEDERAL REGULATIONS**

34 C.F.R. Part 104 ..............................................................................................3

34 C.F.R. § 300.43(a)(1) ...................................................................................15

34 C.F.R. § 300.111(a)(1)(i) ...............................................................................8

34 C.F.R § 300.111(c) .........................................................................................8

34 C.F.R. § 300.148(c) ......................................................................................24

34 C.F.R. § 300.320(b) ......................................................................................15

34 C.F.R. § 300.320(b)(1)-(2) ..........................................................................14

34 C.F.R. § 300.321(b)(3) .................................................................................20

**CALIFORNIA STATE LAW**

Cal. Ed. Code § 56303 .......................................................................................14

Cal. Ed. Code § 56345(a)(8) .............................................................................15

Cal. Ed. Code § 56345(a)(8)(A) ........................................................................15

## OTHER AUTHORITY

Webb, J. T., Amend, E. R., Webb, N. E., Goerss, J., Beljan, P., & Olenchak, F. R. (2005). *Misdiagnosis and dual diagnoses of gifted children and adults*: *ADHD, bipolar, OCD, Asperger's, depression and other disorders*. 125-136, Scottsdale, AZ: Great Potential Press ........................................................................1

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# I. **INTRODUCTION**

A primary purpose of the Individuals with Disabilities Education Act ("IDEA") is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A). A further stated purpose in the IDEA is "to assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. §1400(d)(4). To this end, the IDEA places an affirmative duty on school districts to identify, locate, and evaluate all children with disabilities, regardless of the severity of their disabilities. 20 U.S.C. §1412(a)(3); *Dept. of Educ., Haw. v. Cari Rae S.,* 158 F. Supp. 2d 1190, 1193 (D. Haw. 2001) ("Cari Rae").

The instant case demonstrates the grave consequences of not adhering to the stated purposes of the IDEA and affirmative duties provided therein. Plaintiff and Student, A.P., a gifted child plagued with significant mental health and social-emotional deficits, was denied the protections of the IDEA when she needed them most. Children with A.P.'s profile are overlooked for needed supports because their intelligence buoys performance. When their associated learning and social-emotional needs are not timely identified and addressed, the mental health ramifications can be deadly.[1] Here, despite clear evidence of A.P.'s need for special education supports in fall 2017, Defendant Pasadena Unified School District ("District") failed to assess her upon learning of her disabilities, and therefore failed to offer special education and related services. Several months

---

[1] Webb, J. T., Amend, E. R., Webb, N. E., Goerss, J., Beljan, P., & Olenchak, F. R. (2005). *Misdiagnosis and dual diagnoses of gifted children and adults*: *ADHD, bipolar, OCD, Asperger's, depression and other disorders*. 125-136, Scottsdale, AZ: Great Potential Press.

later, A.P. attempted to take her own life. Only then did the District offer to evaluate her for special education.

Following assessments, District convened an individualized education program ("IEP") team meeting in which it failed to offer A.P. an appropriate plan to prepare her for further education, employment, and independent living. District's IEP offer further violated the procedural mandates of the IDEA to ensure A.P. was provided a clear offer of educational placement. As a result, Parents V.P. and B.P. were deprived of their rights to meaningfully participate in the IEP process, and A.P. denied a free appropriate public education (hereinafter "FAPE").

In November 2018, Parents filed a request for an administrative due process hearing with the California Office of Administrative Hearings ("OAH"), alleging denial of educational rights under the IDEA and California law. Parents were unsuccessful in their efforts at hearing. Accordingly, A.P. and Parents (collectively "Plaintiffs") request modified *de novo* review of the record and a determination that the administrative decision is in error.  Plaintiffs allege that a review of the record will also establish that the preponderance of the evidence supports recovery of private costs for appropriate educational placement and psychological services.

## II. PROCEDURAL AND FACTUAL HISTORY

Student, A.P., is a gifted student that also struggles with specific learning disorders, Generalized Anxiety Disorder, Social Anxiety Disorder, and Major Depression Disorder. She therefore presents as a "twice-exceptional" learner, one who is intellectually gifted but suffers a form of disability characterized by asynchronous development (discrepancy between cognitive, emotional, and physical development). Symptoms of A.P.'s condition have historically included debilitating depression and anxiety, associated somatic symptoms characterized by migraines and stomach aches, and dermatillomania (obsessive skin picking).  A.P. has also exhibited deficits in modulating sensory input, navigating social interactions, and reading nonverbal social cues, all of which exacerbate her

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

anxiety, depression, and isolation. (AR-298-321).[2] A.P. has traditionally engaged in school refusal and non-attendance due to her crippling anxiety and depression. (AR-799:19-800:18; 801:6-802:6).

Student enrolled in District in August 2017 for the tenth grade following partial attendance at two different private high schools the previous year where she exhibited anxiety, depression, and school refusal. (AR-799-800; 1080:10-20; 1081:21-1082: 11). A.P. worked with her treating psychologist for several months prior to the enrollment, and A.P. was excited to start school. (AR-1084:25-1085:2; 1087:6-1088:3). Following enrollment, Parents spoke with a District counselor about Student's background and educational history. (AR-1177:24-1179:14). A subsequent Section 504 meeting was scheduled by District to discuss accommodations for Student.[3] (AR-1180:5-16). The meeting was held on September 19, 2017, and included input from two clinical psychologists retained by Parents that treated Student and conducted comprehensive assessment prior to the meeting. Parents provided this assessment to District in seeking help from the District to address A.P.'s needs (AR-804:7-15). The meeting resulted in a 504 plan document that contained multiple references to A.P.'s diagnoses and their manifestations in the educational environment, including school avoidance, inability to manage stress and produce school work, and major depression triggered by anxiety from overwhelming workload. (AR-332-337; 1181:2-12). District did not assess Student for special education eligibility at this time. (AR-802:22-803:3; 810:9-14).

---

[2] The Administrative Record is cited herein as "AR-[page #]: [line or paragraph #]." Citations correspond to pagination found in upper-right corner of the Administrative Record.

[3] Section 504 meetings are in reference to Section 504 of Rehabilitation Act of 1973, a federal civil rights law prohibiting discrimination against students with disabilities. *See* 29 U.S.C. § 794; 34 C.F.R. Part 104.

- 3 -

Following the 504 meeting, A.P. experienced signs of significant anxiety and school refusal. She exhibited behaviors such as refusing to leave her room, refusing to take medication, refusing to eat, and excessive skin picking. (AR-811:16-812:5; 813:9-24; 814:19-816:5; 818:22-819:11; 1092:2-20). Throughout the remainder of the Fall 2017 semester and early Spring 2018 semester, Student was absent from school approximately 30 times and received numerous warnings of truancy and tardiness from the District. (AR-338-342; AR-517). A.P. failed to attend several final exams, and her grades declined in nearly all subjects. (AR-396; 1243:21-1244:6; 1245:22-146:11; 1247:9-19; 1263:20-1264:18). District was aware of A.P.'s attendance issues, as A.P.'s counselor characterized as not waking in time for school or not wanting to go to school because of stress or illness. (AR-1198:19-1199:23). Still, District did not propose to assess Student for special education eligibility.

By the 2017-2018 winter recess, A.P.'s anxiety and depression had worsened. She reported being unhappy with her performance at school, and felt she had no friends or support group. Student isolated herself in her room for most of the day, skipped meals, did not engage in self-care or basic hygiene, and expressed hopelessness. (AR-819:16-820:20; 821:15-25; 1096:4-10).

On January 1, 2018, Student's depression and emotional state deteriorated to the point that she attempted suicide by cutting both her wrists. (AR-821:12-822:23; 1096:11-23). Student was then placed on a 72-hour psychiatric hold. (AR-822:25-823:9; 1096:24-1097:11). Upon her release on January 5, 2018, Student was provided with medical wrap-around services in the home to monitor her mental health. (AR-1133:19-1134:1). It was not until Parents notified the District of A.P.'s suicide attempt and subsequent hospitalization that District first offered to assess Student for special education. (AR-514; 823:10-824:2; 825:11-826:18).

District issued Parents a special education assessment plan on January 10, 2018. The assessment plan proposed assessment in the areas of academic

- 4 -

achievement, health, intellectual development, social/emotional functioning, and educationally related intensive counseling service needs. The assessment plan did not propose to assess Student in the area of post-secondary transition. Parents signed the assessment plan on January 10, 2018. (AR-514; 825:11-826:24).

Meanwhile, at the recommendation of District, Student withdrew from her high school placement and enrolled in a District independent study program. (AR-516, 520-525; 824:3-20). Student continued to suffer from anxiety and engaged in school refusal. Student completed only three assignments in independent study, and was warned of her non-compliance with academic work. (AR-343, 344; 830:4-831:22; 833:10-834:24).

In light of District's inaction and Student's recent attempt on her life, and facing a second consecutive year of academic and social-emotional decline in 2018, Parents, in desperation, sought out a suitable educational placement to address her needs. On March 23, 2018, Parents provided written notice to the District of their intention to unilaterally place student at Bridges Academy, a private school tailored to serving gifted students with social emotional deficits and learning differences. (AR-346; 1025:25-1026:16; 1109:4-13.)

District convened A.P.'s IEP meeting on April 27, 2018. (AR-588). District found student eligible for special education under the eligibility category of emotional disturbance. (AR-581-582; 605). For placement, District devised two different offers. The first offer proposed that Student continue in the District's independent study program. The second was for placement in an unspecified non-public school ("NPS") certified with the state to provide special education supports. (AR-605-606; 847:23-848:23; 848:18-851:2). A District coordinator with limited knowledge of Student, who entered the IEP meeting over two hours after it started, ultimately identified two non-public schools. (AR-606; 851:25-852:12; 1395:2-10; 1396:18-1397:19). Representatives from the two schools were not invited to the IEP meeting, and the District did not explain the essential elements

of the programs, nor why the District believed they were appropriate for A.P. (AR-857:3-13). The resulting IEP document did not name a specific school in the offer of FAPE. (AR-600-603; 605-606; 850:18-851:2; 1419:13-21; 1792:22-1794:5; 1796:21-23).

Parents subsequently toured the two NPS placements discussed at the April 2018 IEP. After visiting both schools and speaking with their head administrators, Parents determined that neither school was appropriate to meet A.P.'s unique needs. (AR-853:7-854:8; 857:14-858:8; 858:19-25). Parents sent correspondence dated May 14, 2018, notifying the District of the inappropriateness of the schools, and their intention to keep Student at Bridges Academy. (AR-392). In the same correspondence, Parents provided their consent to special education eligibility. (*Id.*) *District did not respond to Parents' letter and did not offer an additional IEP meeting to discuss placement.* (AR-862:10-13; 1790:11-1792:17; 1417:12-1418:6). District issued correspondence on July 23, 2018, after the conclusion of the school year, in response to a subsequent Parent letter dated June 19, 2018, but still did not issue an IEP invite. (AR-613-616; 620).

Student's enrollment at Bridges Academy in April 2018 was characterized by success and gains in both academic and emotional domains. Student primarily received "A" and "B" grades, and earned credits from all classes taken. Student consistently attended school, and established meaningful relationships with peers and staff. Student's anxiety and depression, while still present, abated to a manageable degree and did not impede her access to school. (AR-397-409; 862:14-863:4; 863:20-864:10; 865:15-866:6; 873:10-25; 1041:2-8; 1066:11-1067:3; 1109:14-1110:7; 1115:1-21).

On November 27, 2018, A.P. by and through her Parents filed a request for an administrative due process hearing against District alleging violations of the IDEA in regards to District's failure to adequately identify student as a child with a disability, failure to adequately assess student, failure to offer appropriate

placement and services at the April 2018 IEP, and procedural violations stemming from the April 2018 IEP. (AR-1-36). An administrative hearing was conducted across five days in April 2019, and resulted in a June 17, 2019 decision finding for District on all issues. (AR 650-722).

Plaintiffs' appeal of the June 17, 2019 decision was filed on September 13, 2019, requesting partial reversal of the administrative decision.

### III. <u>LEGAL ARGUMENT</u>

The standard of review of IDEA administrative proceedings is as follows: the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993). While the reviewing district court has discretion to give "due weight" to the administrative findings, the weight given is impacted by whether the administrative findings are "thorough and careful" as to demonstrate "sensitivity to the complexity of the issues." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F. 3d 884, 891 (9th Cir. 1995). Thus, the district court conducts a "modified de novo" review of the administrative decision, while questions of law are reviewed de novo. *Katherine G. ex rel Cynthia G. v. Kentfield Sch. Dist.*, 261 F. Supp. 2d. 1159, 1167 (N.D. Cal. 2003); *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887-89 (9th Cir. 2001).

**A. THE DISTRICT FAILED TO ASSESS STUDENT IN VIOLATION OF ITS CHILD FIND OBLIGATIONS, THEREBY DENYING STUDENT NECESSARY SPECIAL EDUCATION SUPPORTS AND SERVICES.**

Under the IDEA's "child find" provisions, all state and local educational agencies have an affirmative obligation to actively and systematically seek out, identify, locate, and evaluate all children with disabilities, including those attending private schools, regardless of the severity of the disability. *See* 20 U.S.C.

- 7 -

§ 1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i). The child find obligation extends to every child suspected of having a disability and in need of special education, even if the child is advancing from grade to grade.  34 C.F.R. § 300.111(c).

The child find duty is triggered when there is knowledge of, or reason to suspect a disability, and reason to suspect that special education services may be needed to address the disability. *Cari Rae,* 158 F.Supp.2d at 1194. The threshold for suspecting that a child has a disability is low, and is based on whether the child should be referred for assessment, not whether the child actually qualifies for services. *Id.* at 1195. If a school district is on notice that a student exhibits symptoms of a disability covered by the IDEA, it must assess the student for special education eligibility, and cannot abrogate its responsibility via informal observation or the subjective opinion of staff. *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1121 (9th Cir. 2016). Evaluating whether the District knew, or had reason to suspect, a disability is based on in the information District actually knew or had reason to know, at the relevant time. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

Though a student may qualify for both special education and 504 accommodations, the District cannot choose a preferred statute to follow, or take a "wait and see" approach before assessing for IDEA eligibility. *Simmons v. Pittsburgh Unified School District*, 2014 WL 2738214 at *15-16 (N.D. Cal. June 11, 2014). The IDEA provides substantive and procedural protections that Section 504 of Rehabilitation Act of 1973 does not offer, including the right to an IEP that meets the unique needs of a child. *Smith v. Robinson,* 468 U.S. 992, 1018 (1984).

Violation of the child find obligation is a procedural violation of the IDEA. *Cari Rae*, *supra*, 158 F.Supp.2d at 1194. A procedural violation constitutes a denial of FAPE if it results in the loss of educational opportunity to student, significantly impedes parent's opportunity to participate in the IEP process, or causes deprivation of education benefits to student. 20 U.S.C. § 1415(f)(3)(E)(ii);

*W.G., et al. v. Board of Trustees of Target Range School Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992).

1. <u>Evidence Presented at the Administrative Due Process Hearing Established that District Failed to Assess Student Despite Actual Knowledge of Her Disability.</u>

District had reason to suspect that A.P. had a disability impacting educational performance at several junctures in fall and winter 2017. First, at the time of her enrollment in August 2017, Parents shared Student's educational history, including her social emotional challenges. (AR-697, ¶13; 1177:24-1179:14). District, aware of Student's history and needs, opted for a 504 meeting. (AR-1179:8-14). Parents notified District, prior to the 504 meeting, that they would invite A.P.'s treating psychologist, and clinical psychologist that performed a psycho-educational assessment of A.P. in summer 2017, to the meeting. (AR-1181:2-12). Thus, at or near the time of enrollment, District was aware that A.P. had social emotional challenges, had attended several private schools prior to arriving at the District, and that A.P. had a treating psychologist and psychological evaluation. District's proposal for a 504 plan meeting evidenced its suspicion that A.P. had a disability that impeded her access to learning. (AR-1184:24-1185:9 [District testimony that purpose of a 504 plan is to notify teachers how a child's condition "hinders or—or impedes a child's progress and performance when in the classroom"]).

At the subsequent 504 plan meeting on September 19, 2017, District received actual knowledge that A.P. was a child with disabilities. During the meeting, Parents shared that A.P. suffered from anxiety, major depressive disorder, and learning disorders. (AR-802:7-21). A clinical psychologist that assessed A.P. earlier that summer reported on her assessment findings and provided copies of her psycho-educational evaluation to the District at the meeting. (AR-296-331; 332; 804:7-18; 809:21-810:14: 931:12-22; 1182:3-9). This report outlined A.P.'s recent

- 9 -

history of school refusal caused by anxiety and stress. (AR- 301, 317). A.P.'s treating psychologist provided further feedback regarding A.P.'s educational needs. (AR-1088:4-11; 1089:23-25). No District assessment was conducted prior to the 504 meeting to determine A.P.'s needs. (AR-1203:22-1204:7).

A 504 document was created by District, documenting discussion of A.P.'s disabilities at the 504 meeting. (AR-332-337). The 504 document noted the private pscyho-educational assessment findings, including diagnoses of nonverbal learning disability, social anxiety, difficulty expressing learned concepts, a lack of fluid reasoning in relation to complex problem solving, and specific learning disorder. (AR-332). The 504 document also noted that A.P. had "depression triggered by onset of anxiety and stress due to overwhelming workload or pressure." (AR-333). Further, the document specifically identified A.P.'s nonverbal learning disability and social anxiety disorder as a "potentially limiting mental or physical disability" causing avoidance of school attendance and academic assignments, and that her conditions substantially limited a major life activity. (AR-334). The document concluded A.P.'s "specific learning disability may result in high stress, inability to manage and to engage in school work," and she required accommodations for "[m]ajor depression…due to overwhelming stress or anxiety." (AR-334, 337).

Thus, District received direct information at the September 19, 2017 meeting from Parents and A.P.'s psychological team that she was a student with disabilities, and clearly documented this information in its own 504 documentation.  Despite actual knowledge of A.P.'s disability, District did not offer to evaluate Student for special education. (AR-802:22-803:3; 810:9-14).

Consistent with her reported disabilities as noted in District's 504 documentation, A.P. continued to experienced and exhibited signs of significant anxiety and school refusal in the months following the 504 meeting, including behaviors such as refusing to leave her room, refusing medication, refusing to eat, skin picking, poor hygiene, and school refusal. (AR-801:15-802:6; 811:24-812:5;

813:9-16; 818:22-819:6; 1092:2-20). Throughout the remainder of the fall semester and early spring semester, Student was absent from school on thirty occasions. (AR-517 [Student attendance record showing thirty total excused and unexcused absences]). During this time, Parents received at least five notices of tardiness and truancy from the District. (AR-338-342). A.P. failed to participate in several final exams, and her grades in nearly all subjects fell from the beginning of the semester. (AR-396; 1243:21-1244:6; 1245:22-146:11; 1247:9-19; 1263:20-1264:18). A.P.'s disability was impeding her ability to attend school in fall 2017. Still, District did not offer to assess for special education. (AR-802:22-803:3).

District's failure to timely assess A.P. for special education at the time of enrollment and thereafter resulted in a denial of a FAPE under the IDEA. Had A.P. been assessed in fall 2017, she would have had the opportunity to receive needed supports and services to help her access learning. Without these supports, A.P.'s mental health declined, she refused school, and attempted suicide. (AR-821:12-822:23; 1096:11-23). District first found A.P. eligible for special education on April 27, 2018. (AR-588-612). By then, she was unsuccessful at two different placements within the District. (AR-343, 344, 516, 520-525; 824:3-20, 830:4-831:22; 833:10-834:24). District's failure to assess A.P. for special education impeded her ability to secure needed supports to successfully attend school, and denied Parents and A.P. participation in the IEP process in fall 2017.

2. The Administrative Findings Concerning Child Find Should Not Receive "Due Weight."

The administrative decision was not "thorough and careful" as to demonstrate "sensitivity to the complexity of the issues" in regards to the District's child find obligation. *Capistrano Unified*, 59 F.3d at 891. The administrative decision found that "Pasadena had no reason to assess Student for special education at the time of the Section 504 meeting" because of Student's "excelling grades and attendance," and because "diagnoses by a clinical psychologist based

on Diagnostic Manual criteria are not determinative of whether a Student is eligible for special education." (AR-697, ¶ 14). The administrative law judge's ("ALJ's") analysis flatly omits highly relevant testimony from Parent, A.P.'s psychological team, and District regarding the information shared at the 504 meeting (AR-296-331; 332; 802:7-21; 804:7-18; 809:21-810:14: 931:12-22; 1088:4-11; 1089:23-25; 1185:10-22), and ignores documentary evidence revealing the District's actual knowledge of Student's disabilities and corresponding impairments impacting her educational performance. (AR-296-331; 332-337).

Further, the ALJ's reliance on grades, attendance, and clinical diagnoses is misplaced and contradicted by law cited in her decision. The bar for child find is low, and is triggered when there is a *reason to suspect* a disability and potential need for services. *Cari Rae,* 158 F.Supp.2d at 1194-95. Courts in this circuit have held that "[i]nformed suspicions of parents, who may have consulted outside experts," "informed suspicions of outside experts," and absences have all been considered as triggers for District's duty to assess. *See Timothy O.*, *supra,* 822 F.3d at 1120 (citing *Pasatiempo v. Aizawa,* 103 F.3d 796, 802 (9th Cir. 1996) and *N.B. v. Hellgate Elementary School District*, 541 F.3d 1202 (9th Cir. 2008)); *Cari Rae, supra,* 158 F. Supp. 2d at 1195.

The above elements were all present in this case. Parents consulted with outside experts, shared their informed suspicions, and had their private experts affirmatively share findings with the District at the 504 meeting. While A.P.'s grades and attendance were initially satisfactory mere weeks into the school year, they declined for the very reasons outlined in the 504 documentation and private evaluation. (AR-301, 317, 332-334, 337; 396; 517; 1243:21-1244:6; 1245:22-146:11; 1247:9-19; 1263:20-1264:18). The decision cites no authority dictating grades and attendance as more determinative than the above factors; in fact, this circuit has held that it is not the District's suspicion alone that activates procedural protections of the IDEA. *Pasatiempo*, 103 F.3d at 801-02.

Moreover, the decision relies on non-binding and somewhat inapplicable guidance from the Office of Special Education Programs ("OSEP") to assert that a diagnosis pursuant to the Diagnostic Manual is "not synonymous with eligibility under the IDEA," and thus District had no reason to assess in light of the findings in the summer 2017 private evaluation. The OSEP letter is not related to child find analysis, and the decision omits authority providing that clinical diagnoses cannot be considered in this analysis. To the contrary, the authority cited above provides that input from outside experts triggers the duty to assess. *Timothy O.*, 822 F.3d at 1120. The decision thus places non-binding OSEP guidance unrelated to child find ahead of binding authority from this circuit.

The decision improperly dismissed A.P.'s attendance and grade declines following the 504 meeting and concluded the District was somehow unaware that they were related to A.P.'s disabilities.  (AR-698, ¶¶ 15-18). The ALJ again ignored the District's 504 document and psycho-educational report that explicitly referenced A.P.'s struggles with school refusal and work avoidance due to depression and anxiety. (AR-301, 317, 332-337). The ALJ also failed to consider testimony from A.P.'s psychologist, Parent, and District counselor that revealed discussion at the 504 meeting of A.P.'s struggles with anxiety and depression, and resulting issues with attendance and school refusal. (AR-802:7-21; 804:7-18; 809:21-810:14: 931:12-22; 1088:4-11; 1089:23-25; 1185:10-22). The ALJ noted that A.P.'s teachers did not report negative changes in behavior, but failed to cite A.P.'s absences during final exams, the thirty total absences in fall 2017, or that District's counselor knew A.P.'s absences were related to stress and school avoidance. (AR-338-342; 396; 517; 1198:19-1199:23; 1243:21-1244:6; 1245:22-146:11; 1247:9-19; 1263:20-1264:18). The ALJ claimed District did not have reason to suspect A.P.'s attendance issues stemmed from her social emotional state, but Parent testified that she notified the school of absences, and that A.P.'s treating psychologist contacted District to explain the absences were linked to her

1  mental health challenges. (AR-815:4-11; 821:5-11)   This evidence establishes

2  District was aware of the nexus between A.P.'s school refusal and her disabilities.

3       The ALJ found that District "was entitled to wait for a reasonable period"

4  after the 504 meeting to see if the 504 accommodations worked. (AR-698, ¶ 17).

5  The decision cites to California Education Code section 56303 (AR-697, ¶ 12),

6  providing that resources of the regular education program must be considered prior

7  to referral to special education. Reliance on section 56303 is misplaced in this case.

8  This provision does not apply to assessment, nor does it suspend District's duty to

9  assess when considering regular education for a student.  Even if section 56303 did

10 apply, the IDEA takes precedent, and thus the child find duty cannot be excused.

11 *See Hacienda La Puente Sch. Dist. of Los Angeles v. Honig*, 876 F.2d 487, 495

12 (9th Cir. 1992); *RB ex rel. Parent v. Mastery Charter School*, 762 F.Supp.2d 745,

13 762 (E.D. Pa. 2010). The ALJ ignored authority that the District cannot delay

14 assessment by offering accommodations in the regular education setting, and that

15 such approach denies meaningful participation in the IEP process. *Simmons,* 2014

16 WL 2738214 at *15-16. The ALJ also ignored evidence demonstrating A.P.'s

17 performance and attendance declined despite 504 accommodations, and that she

18 required more intensive support to access learning. (AR-317-319, 332-334, 337;

19 338-342;  396;  517;  1243:21-1244:6;  1245:22-146:11;  1247:9-19;  1263:20-

20 1264:18).

21 **B. THE DISTRICT FAILED TO CONDUCT A POST-SECONDARY**

22 **TRANSITION ASSESSMENT, AND FAILED TO OFFER**

23 **APPROPRIATE POST-SECONDARY TRANSITION SERVICES.**

24      IDEA and California law require that by the time a child with a disability

25 reaches the age of 16, the school district must have an IEP in effect that includes

26 "appropriate measurable postsecondary goals based upon age appropriate transition

27 assessments related to training, education, employment, and where appropriate,

28 independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb); 34 C.F.R.

§ 300.320(b)(1)-(2); Cal. Ed. Code § 56345(a)(8). This provision was added to the 2004 reauthorization and revision of the IDEA, specifically to address Congressional findings that "providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities." 20 U.S.C. § 1400(c)(14).

An IEP must contain the transition services needed to assist the pupil in reaching post-secondary goals. 34 C.F.R. § 300.320(b); Cal. Ed. Code, § 56345(a)(8)(A). Federal regulations highlight the importance of transition planning and services being "designed to be *within a results-oriented process*, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities." 34 C.F.R. § 300.43(a)(1) [emphasis added].

1. The District Did Not Conduct an Age-Appropriate Transition Assessment.

Here, it is undisputed that "no informal age-appropriate transition assessment" was conducted. (AR-709, ¶ 68). A.P. turned 16 prior to the April 2018 IEP, but District's assessment plan signed by Parents did not include a transition assessment, and witnesses confirmed the absence of formal assessment. (AR-513-514; 869:17-870:5; 1413:25-1415:10). Though the transition plan in the April 2018 IEP indicated that a brief interview of Student was conducted, the decision accurately found "there was likely no informal age-appropriate transition assessment." (AR-709, ¶ 68). Even if there was a brief interview of Student, this would have been insufficient. *S.G.W., et al. v. Eugene School Dist.*, Case No. 6:16-cv-01612-AA at *13 (D. Or. 2017) (citing *Forest Grove Sch. Dist. v. Student*, 2014 WL 2592654, at *29 (D. Or. 2014)).

2. The Lack of Assessment and District's Transition Plan in the IEP Resulted in Educational Harm.

The ALJ incorrectly found that the lack of transition assessment was a "harmless procedural violation." (AR-711, ¶ 75). Case law in this circuit has

- 15 -

established that lack of transition assessment necessarily results in educational harm because it denies participation in the IEP process. In *Carrie I. ex rel. Greg I. v. Dep't of Educ., Hawaii,* 869 F.Supp.2d 1225 (D. Haw. 2012), the court affirmed an administrative finding of educational harm due to lack of transition services, in large part due to the lack of transition assessment. There was no dispute that a transition assessment did not occur, and the court held that "[t]he lack of assessments alone is enough to constitute a lost educational opportunity." *Carrie I.,* 869 F.Supp.2d at 1247. Citing *L.M. v. Capistrano Unified School Dist.*, 556 F.3d 900, 909 (9th Cir. 2009), the court held that even if there was no lost educational opportunity, the lack of transition assessment denied student of "*any* opportunity to participate" in the IEP process. *Id.*

Here, without transition assessment, A.P. and her parents were denied the opportunity to participate in the development of her IEP and transition supports. Neither Parents nor A.P. were consulted in the preparation of the transition plan and services, and Parents were not aware of the information District used to complete the plan. (AR- AR-709, ¶ 68; 848:16-21; 869:21-870:8).

The lack of transition assessment also results in educational harm if the transition supports offered are inadequate. In *S.G.W.*, *supra*, the district court affirmed the ALJ's findings of inadequate transition plan and services. The transition goals, while measureable, "were not based on age appropriate transition assessments." *S.G.W.*, 6:16-cv-01612-AA at *12. Further, while the IEP offered transitions classes, participation in a career day, and a visit to a local community college, such offerings were insufficient because they were "not individualized to meet student's needs." *Id.* The court opined on the difficulty of showing educational harm when disputing transition services, noting that it's appropriate to rely on "the extent to which the transition services were individually tailored to meet student's needs." *Id.* at *14. Other factors relevant in determining the inadequacy of transition supports include whether the IEP has, "a generic and

somewhat vague formula of post-high school goals and services, equally applicable to almost any high school student," and the failure to consult student and parents in preparation of the plan. *See Virginia S. v. Dept. of Educ.*, 2007 U.S. Dist. Lexis 1518 at *24-25 (D. Hawaii, Jan. 8, 2007).

District's offered transition plan and services in the April 2018 IEP were similarly deficient. The IEP was not based on an age-appropriate transition assessment, and thus the goals and services therein were not based on evaluation of A.P.'s post-secondary needs, interests, or strengths. Further, neither Parents nor A.P. were consulted in preparation of the plan, and District testified that its transition plans are generated without assessment. (AR-1414:6-12). The IEP contains a generic employment goal to "work on a resume" and discuss career opportunities, while the transition plan contains generic, unmeasurable goals that merely provide that A.P. will "work towards becoming an actress." (AR-598, 607). No independent living goal was offered despite A.P.'s noted deficits in daily living skills.[4] (AR-607; 801:11-802:6; 1092:2-20). The "activities" and "community experiences" offered in the plan are not individualized to A.P. and could apply to any student (e.g. "identify skills and talents," "meet with Counselor for academic counseling," "attend field trips to local community colleges"). (AR-607). Notably, the goals and activities fail to take into account A.P.'s unique struggles with independent task initiation and completion, self-advocacy, and especially her major depression and anxiety resulting in school refusal. (AR-317, 318; 551, 579, 580; 807:16-23; 815:12-816:5;1092:2-20). Though the IEP offers generic services listed as "Career Awareness" and "Vocational assessment, counseling, guidance, and career assessment," they are limited to just one hour yearly and the IEP does not

---

[4] The ALJ improperly dismissed A.P.'s deficits in living skills as only occurring "during bouts of serious depression or anxiety." (AR-710, ¶ 70). These deficits were seen before and after the "bouts of serious depression" that lead to her attempted suicide. (AR-801:11-802:6;1092:2-20; 1115:1-10; 1115:25-1117:7).

describe the service components. (AR-600). These services were not discussed at the IEP, and District's testimony that transition supports are generated without assessment further evidences their generic nature. (AR-848:16-21; 869:21-870:8; 1414:6-12).

District's failure to conduct a transition assessment resulted in a deficient transition plan that was not individualized to A.P.'s needs or interests. Without assessment, Parents could not meaningfully participate in the determination of her post-secondary transition supports, and A.P. suffered educational harm by being presented with a plan not individualized to her needs.

> 3. The Administrative Findings Concerning Transition Supports Should Not Receive "Due Weight."

The administrative decision contains several glaring flaws in its transition analysis. The ALJ cited to *M.M. v. New York City Dept. of Ed.*, 655 Fed.Appx. 868 (2d Cir. 2016) for support, but reliance on this authority is misguided. The citation to *M.M.* is to a summary order from the Second Circuit, and the order clearly states it does not have precedential effect. *M.M.*, 655 Fed.Appx. 868 (Case No. 15-1200). Further, the brief order contains no analysis on the issue of transition assessment. *Id.* The underlying district court decision in *M.M.* is inapposite. *M.M. v. New York City Dept. of Ed.*, Case No. 1:14-cv-01542-GBD (S.D.N.Y. Mar. 18, 2015). There, student's principal argument was whether the lack of transition assessment denied parents sufficient information to make an informed decision regarding district's placement offer. *Id.* at *11. The district court found the IEP team had sufficient information about student's transition needs to develop his IEP, citing testimony of an IEP coordinator demonstrating that the offered placement could address all of student's transition goals. *Id.* at *12. Here, A.P. does not assert the lack of transition assessment prevented consideration of the placement offer, but that she was denied educational benefit and participation in the IEP process.

The ALJ relies heavily on *Virginia S.*, *supra*, and *Lessard v. Wilton-Lyndeborough Coop. School Dist.*, 518 F.3d 18 (1st Cir. 2008), to assert that the IEP contained sufficient content to meet transition requirements. The ALJ's analysis of both cases is flawed. In *Virginia S.*, the transition plan at issue was procedurally deficient, but the court found no educational harm primarily because student was entering tenth grade, rather than eleventh or twelfth grade. *Virginia S.*, 2007 U.S. Dist. Lexis 1518 at *24-26. Here, A.P. was entering eleventh grade shortly after the IEP, making her transition plan highly relevant to her education. (AR-588).

The ALJ relied on *Lessard* to assert that "the test in evaluating a transition plan is whether the IEP, taken in its entirety, was reasonably calculated to enable…educational benefits." (AR-710, ¶ 74). However, *Lessard* analyzed transition requirements prior to the 2004 reauthorization of the IDEA, when the law did not require transition assessments or measurable postsecondary goals. *Lessard*, 518 F.3d at 21; *Carrie I.*, 869 F.Supp.2d at 1244, fn.9. Assuming *arguendo* that *Lessard* applied, A.P.'s IEP, if examined in its entirety, does not remotely contain the "wide array of other transition services" found in *Lessard* that made the IEP appropriate, including "six hours of pre-vocational training each week and regular instruction in specific transition-related skills." *Lessard*, 518 F.3d at 30. Moreover, even if the IEP contained goals or supports that addressed A.P.'s overall goals or needs, the District cannot escape "its statutory obligation to provide appropriate, measureable goals developed according to timely transition assessments." *Dracut Sch. Comm. V. Bureau of Special Educ. Appeals of Mass. Dep't of Elem. & Secondary Educ.*, 737 F.Supp.2d 35, 51 (D. Mass. 2010).

Lastly, the ALJ improperly dismissed A.P.'s contention that a representative from the placements offered should have been invited to the IEP. (AR- 710, ¶73). The law is clear that "to the extent appropriate, with the consent of the parents or a child who has reached the age of majority…the public agency must invite a

representative of any participating agency that is likely to be responsible for providing or paying for transition services." 34 C.F.R. § 300.321(b)(3). The IEP listed "Nonpublic school (NPS)" as the provider for the transition services. (AR-600). Thus, an NPS representative should have been present as a necessary source of information for the team.

## C. DISTRICT FAILED TO MAKE A SPECIFIC OFFER OF PLACEMENT, THEREBY PROCEDURALLY DENYING STUDENT A FAPE.

An important aspect of the parents' right to participate in the IEP process is the district's obligation to make a formal, written offer which clearly identifies the proposed program. *Union Sch. Dist. v. Smith* 15 F.3d 1519, 1526 (9th Cir. 1994). The requirement of a formal, written offer alerts the parents to the need to consider seriously whether the offered placement was an appropriate placement under the IDEA so that the parents can decide whether to oppose the offered placement or to accept it with the supplement of additional education services. *Glendale Unified School Dist. v. Almasi*, 122 F.Supp.2d 1093, 1107 (C.D. Cal. 2000) (citing *Union*, 15 F.3d at 1526). A formal written offer is more than a mere technicality, and is vigorously enforced. *Union*, 15 F.3d at 1526.

1. District's Offer of Two Distinct School Placements Precluded Meaningful Participation and Informed Consent to the IEP.

In *Glendale*, the District offered student multiple placement options at the IEP, "each of which included participation in a distinct program." *Glendale*, 122 F.Supp.2d at 1107. The court held that "a school district cannot abdicate its responsibility to make a specific offer allowing a parent to choose from among several programs presented as formal offers." The court noted that "[a]fter discussing the advantages and disadvantages of various programs that might serve the needs of a particular child, the *school district must take the final step* and clearly identify an appropriate placement from the range of possibilities." *Id.* at

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1108, (emphasis added). In applying *Union*, the court further held that "offering a variety of placements puts an undue burden on a parent to eliminate potentially inappropriate placements, and makes it more difficult for a parent to decide whether to accept or challenge the school district's offer." *Id.* Accordingly, Union "require[s] that the District formally offer a single, specific program." *Id.* at 1107.

Similarly, in *A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672, 681 (4th Cir. 2007), the court held "as a matter of law that because [the district] failed to identify a particular school, the IEP was not reasonably calculated to enable [the student] to receive educational benefits." In that case, the IEP recommended a private day school, but did not specify the specific schools being considered. *Id.* The court reasoned that without a specific school named, "the parents were left to fend for themselves to determine whether any private day school in their area ... would be a satisfactory fit." *Id.*

Even when the NPS level of instruction is appropriate for student, an offer with multiple NPS placements is procedurally deficient because it deprives parents of informed consent. *Parents on Behalf of Student v. Poway Unified School District,* (OAH CA 2018) OAH No. 2018060763, 2018080048 at pp. 25, 28, 44. Factors relevant to showing a denial of FAPE include: omission of specific information regarding the specific classroom placement, the teacher or type of curriculum provided, or the contents of the program; district's failure to invite a representative from the NPS placements to the IEP to present information and answer questions; speaking in "generalities as to what the nonpublic schools provided"; and failing to provide more comprehensive information to Parents following the IEP. *Id.* at 44-45.

Here, A.P. was presented with an unclear offer of placement at the April 2018 IEP. As in *Glendale*, *A.K.*, and *Poway*, the District offered multiple placements. After Parents voiced their concern with the independent study placement offer, the District made a second offer of placement at an unspecified

NPS. (AR-603, 605). At this point, more than two hours into the meeting, and after considerable discussion of A.P.'s needs, the District brought in a new District team member to discuss the offer. (AR-606; 1395:2-10; 1396:18-1397:19.) The team member discussed two distinct NPS placements: Hillside Learning Center and STEM-3 Academy. (AR-606). The resulting IEP document did not identify a specific school offer, but instead listed "Nonpublic day school" as the placement offered. (AR-603, 606). Parents were not clear which NPS placement the District was offering, and the IEP team did not identify a specific NPS for Parents to accept, even as of July 2018. (AR-850:18-851:2; 857:3-13; 1419:13-21).

District's offer of generic NPS placement, with discussion of two different schools, was a denial of FAPE. Similar to *Poway*, the District here did not invite NPS representatives to the IEP meeting. (AR-611). Moreover, the District did not provide vital information about the placements, including the specific classroom where A.P. would be placed, the teacher or type of curriculum to be provided, or the contents of the specific program at either school. (AR-857:3-13; 1366:7-14). Only generalities of the two schools were shared, and no one at the IEP meeting was able to express how the schools could be a FAPE for A.P. (*Id.*) Subsequent to the IEP meeting, Parents visited Hillside and STEM-3, notified District of their concerns with the placements, but District did not convene another IEP meeting. (AR-392; 858:19-859:8; 862:1-12; 1790:11-1791:24; 1792:2-17).

In sum, the District did not take the final step in offering a specific NPS, and Parents were left to fend for themselves to determine whether Hillside or STEM-3 were appropriate for A.P. The District's failure to offer a specific NPS placement placed an undue burden on Parents to eliminate inappropriate placements, and the District's failure to provide specific details about the schools and their ability to meet A.P.'s needs precluded Parents' ability to provide informed consent.

The ALJ improperly relied on *Rachel H. v. Dept. of Ed., State of Hawaii*, 868 F.3d 1085 (9th Cir. 2017) to conclude that identification of a particular school

_____
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

was not required. (AR-711, ¶78). *Rachel H.* concerned whether the IDEA's requirement that the location of services be noted in the IEP also required District to name the specific public school student would attend. The student had moved to a new city and was to attend a public school, but student contended that her last IEP placement offer of a generic "public school campus" deprived parents basic information concerning the FAPE offer. *Rachel H.*, 868 F.3d at 1087, 1092. In contrast, A.P. was offered NPS placement outside of the District, not a regular District public school. As District testified, NPS placements differ from school to school, and A.P. had unique needs associated with her disabilities that could not be served by just any NPS. (AR-1619:13-24;1763:20-1764:7; 1765:9-20). Thus, the issue is whether failure to specify the NPS offered, and provide specifics as to that NPS, precluded meaningful participation and informed consent to the IEP.

As the *Rachel H.* court noted, "knowledge of a particular school, classroom, or teacher may well be relevant to allowing parents to participate meaningfully in the IEP process," and may be required to allow Parents to "evaluate whether a proposed IEP satisfies the IDEA because of a particular special education need caused by a child's disability." *Id.* at 1092 (citing *A.K., supra*, at 681). This is the case here. Generally discussing two NPS placements was not sufficient; Parents were not provided information about how the placements would meet A.P.'s unique needs, and ultimately were not provided with a specific school to evaluate. (AR-850:18-851:2; 857:3-13). As in *A.K.*, *supra*, Parents were left to fend for themselves to determine the appropriateness of the two schools discussed.

2. <u>The Administrative Findings Concerning Clarity of Offer Should Not Receive "Due Weight."</u>

The ALJ erroneously concluded, without any support, that there was no question about whether the two schools could implement the IEP. (AR-713 ¶83). This was very much in dispute on the issue of placement. (AR-392; 606; 857:3-13; 853:4-854:8; 857:14-858:25). Further, the decision improperly weighed the

- 23 -

testimony of the District IEP team member who discussed the two NPS placements at the IEP. The ALJ relied heavily on his testimony to conclude there was specific discussion of both schools and Parents meaningfully participated. (AR-713, § 83-84). The ALJ failed to properly consider that this member entered the IEP two hours late, admitted having limited knowledge of A.P., and that he testified to specifics of the schools only after visiting them a month prior to hearing. (AR-1395:2-10; 1396:18-1397:19; 1420:7-1421:25). His testimony did not establish specifics of the schools were discussed at the meeting, nor that he had sufficient knowledge of A.P.'s needs to make an informed offer.

The decision also gave undue weight to District testimony to conclude that District did not have to name a specific school. (AR-713, § 85). This testimony came from a District special education director that was not employed by the District at the time of the IEP, and did not participate in the meeting. (AR-1794:16-23; 1799:11-18). Further, the ALJ provided no legal justification that District could name multiple schools in its offer because Parents had to first visit the schools and seek enrollment. The ALJ places an undue burden on Parents to secure enrollment at an NPS offered by District. The District could have easily consulted with potential schools prior to and during the IEP to determine availability and fit.

**D. THE ADMINISTRATIVE DECISION SHOULD BE REVERSED, THUS ENTITLING STUDENT TO REIMBURSEMENT.**

A parent may be entitled to reimbursement for placing a student in a private placement, without the agreement of the local school district, if the parents prove that the district did not make a FAPE available to the student in a timely manner prior to placement, and the private placement was appropriate.  20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c); *School Committee of Town of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369-70 (1985). In assessing the appropriateness of a unilateral placement, the totality of the circumstances must be considered in determining whether the placement

reasonably serves a child's individual needs. *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 113-15 (2d. Cir. 2007). Parents may receive reimbursement for the unilateral placement if the placement met the child's unique needs and provided him or her with educational benefit. *Florence County School District Four v. Carter*, 510 U.S. 7, 13-14 (1993).

Here, the District denied A.P. a FAPE by failing to offer special education services prior to the April 27, 2018 IEP. A.P. was unilaterally placed at Bridges on or about April 9, 2018, and Parents provided appropriate notice on or about March 23, 2018. (AR-346). The District did not make a FAPE available to A.P. prior to the unilateral placement. Bridges was also appropriate for A.P. and provided educational benefit. Grade reports following her enrollment show primarily A and B grades in nearly all subject areas, and that A.P. consistently produced work. (AR-397-409). She ceased engaging in school refusal due to her anxiety, was no longer depressed, and performed significantly better than when she was in the District. (AR-862:14-863:2; 1115:1-21). Moving her following the April IEP "would have been taking her home away." (AR-865:24-866:6).

In this case, overturning of the OAH decision and ordering the District to reimburse Student's private costs paid by Parents is the appropriate relief.  Such relief includes non-reimbursed expenses for tuition at Bridges Academy and related transportation costs, psychological counseling services, and private post-secondary career transition services. The OAH decision is legally and factually in error and the preponderance of the evidence supports Plaintiffs' requests for relief.

Dated:        October 15, 2020

Respectfully submitted,
WOODSMALL LAW GROUP, PC


By:        _____/s/_____
                Mark Woodsmall
                Attorney for Plaintiffs

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

Case Name: A.P., et al. v. Pasadena Unified School District

Case No.:    2:19-CV-07965-MWF (SSx)

On October 15, 2020, I filed the following document(s) described as **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** electronically through the CM/ECF system.  All parties on the Notice of Electronic Filing to receive electronic notice have been served through the CM/ECF system.

The parties listed below are currently on the list to receive e-mail notices for this case.

| | |
|---|---|
| Jeff C. Marderosian, Esq. SBN 90463<br>Meredith B. Reynolds, Esq. SBN 208588<br>LAW OFFICES OF JEFF C. MARDEROSIAN<br>301 East Colorado Blvd., Suite 714<br>Pasadena, CA 91011<br>Telephone: (626) 792-3957<br>Facsimile: (626) 792-2623 | Attorneys for Defendant |

| | |
|---|---|
| x | **BY EMAIL:** I have caused the above-mentioned document(s) to be electronically served on the above-mentioned person(s), who are currently on the list to receive e-mail notices for this case. |

Executed on October 15, 2020, at Pasadena, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

/s/ Justin Youngs
Justin Youngs

- 1 -

PROOF OF SERVICE